# Legal Authority to Approve Changes in Use of Property Under Section 414 of the Housing and Urban Development Act of 1969

The proposed sale of property at its fair market value in order to raise funds to build low and moderate income housing on different property constitutes a change in the use of property under section 414 of the Housing and Urban Development Act of 1969 and the terms of the deed of the 1974 sale of the property.

The Department of Housing and Urban Development and the General Services Administration could approve the proposed sale of property to a public body without violating section 414.

March 5, 1996

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION

This memorandum responds to your request for our legal opinion on the proper interpretation of section 414 of the Housing and Urban Development Act of 1969, 40 U.S.C. § 484b as applied to a proposed transaction relating to certain property in the San Patricio area of San Juan, Puerto Rico. The transaction at issue involves property that was sold pursuant to section 414 on September 27, 1974, to the Puerto Rico Urban Renewal and Housing Corporation (known by its Spanish acronym "CRUV"), a public corporation in San Juan, Puerto Rico. During the succeeding twenty years, CRUV and its successor attempted without success to facilitate the development of low and moderate income housing on the property. CRUV's successor recently asked the United States for permission to sell the property at its fair market value without restriction concerning its use and to use the sale proceeds, in part, to build low and moderate income housing in other areas of Puerto Rico.

We have been asked to address whether the proposed transaction would constitute a change in the use of the property and if so, whether the United States could approve such change under the strictures of section 414. As discussed below, we conclude that the proposed sale would constitute a change in the use of the property, which under the terms of the deed must be approved by the appropriate agencies of the United States government. We believe that the Department of Housing and Urban Development ("HUD") and the General Services Administration ("GSA") could provide the required approval without violating section 414. We have not addressed, however, the policy implications of or merits in approving the proposed transaction.

# I. Background

## A. *Section 414*

At the time of the sale of the property to CRUV in 1974, section 414 of the Housing and Urban Development Act of 1969, 40 U.S.C. § 484b, stated in relevant part:

> (a) . . . any surplus real property . . . may in the discretion of the Administrator of General Services be transferred to the Secretary of Housing and Urban Development at his request for sale or lease by him at its fair value for use in the provision of housing to be occupied by families or individuals of low or moderate income, [and for related public facilities and for related commercial and industrial facilities approved by the Secretary.] Any such sale or lease of surplus land shall be made only to (1) a public body which will use the land in connection with the development of a low-rent housing project assisted under the United States Housing Act of 1937, or under a State or local program found by the Secretary of Housing and Urban Development to have the same general purposes as the Federal program under such Act, or (2) a purchaser or lessee who will use the land in connection with the development of housing (A) with respect to which annual payments will be made to the housing owner pursuant to section 1701s of Title 12, (B) financed with a mortgage which receives the benefit of the interest rate provided for in the proviso in section 1751(d)(5) of Title 12, or (C) with respect to which interest reduction payments will be made under section 1715z or 1715z-1 of Title 12 . . . .
>
> (b) As a condition to any sale or lease of surplus land under this section to a purchaser or lessee other than a public body, the Secretary shall obtain such undertakings as he may consider appropriate to assure that the property will be used in the provision of housing and related facilities to be occupied by families or individuals of low or moderate income for a period of not less than forty years. If during such period the property is used for any purpose other than the purpose for which it was sold or leased it shall revert to the United States (or, in the case of leased property, the lease shall terminate) unless the Secretary and the Administrator of General Services, after the expiration of the first twenty years of such period, have approved the use of the property for such other purpose. The Secretary shall notify the Committees on Banking and

Currency and the Committees on Government Operations of the Senate and House of Representatives whenever any surplus land is sold or leased by him, or he and the Administrator of General Services approve a change in the use of any surplus land therefore sold or leased by him, pursuant to the authority of this section. [1]

Section 414 was originally adopted by Congress on December 24, 1969, as part of the Housing and Urban Development Act of 1969, Pub. L. No. 91–152, tit. IV, § 414, 83 Stat. 379, 400. The purpose of the 1969 Act was to extend existing housing and urban development programs, provide funding for these programs and to improve programs to make them more helpful to low- and moderate-income families. *See* House Comm. on Banking and Currency, 91st Cong., *Housing and Urban Development Act of 1969* (Comm. Print 1969); H.R. Conf. Rep. No. 91–740 (1969); H.R. Rep. No. 91–539 (1969); S. Rep. No. 91–392 (1969).

The statute was amended in 1978 and 1980 and repealed in 1983. The most notable changes in the 1978 amendment included the addition of language to subsection (a) allowing for the property to ''be occupied predominantly by families or individuals of low and moderate income'' and an expansion of the eligible housing programs that could provide assistance. Subsection (b) was modified by changing forty years to thirty years and requiring that the property be used ''to the maximum practicable extent'' for the required housing. The reporting requirements to Congress were also deleted. *See* Housing and Community Development Amendments of 1978, Pub. L. No. 95–557, § 317(a), (b), 92 Stat. 2080, 2100. The 1980 amendment added the Secretary of Agriculture as an eligible recipient of surplus property. *See* Housing and Community Development Act of 1980, Pub. L. No. 96–399, 94 Stat. 1614, 1669.

With the 1980 amendments, the statute stated in relevant part:

(a) . . . any Federal surplus real property . . . may, in the discretion of the Administrator of General Services, be transferred to the Secretary of Housing and Urban Development or the Secretary of Agriculture at the request of either such Secretary for sale or lease by either Secretary at its fair value for use in the provision of housing to be occupied predominantly by families or individuals of low- or moderate-income, assisted under a Federal housing assistance program administered by the Secretary of Housing and Urban Development or the Secretary of Agriculture or under a State or local program found by the appropriate Secretary to have the same gen-

---

[1] The statute had been amended once since its original adoption, making minor changes not relevant to the issues here. *See* Housing and Urban Development Act of 1970, Pub. L. No. 91–609, 84 Stat. 1770, 1816.

eral purpose, and for related public commercial or industrial facilities approved by the appropriate Secretary. . . .

(b) As a condition of any disposition by the Secretary of Federal surplus real property under this section to an entity other than a public body, the Secretary shall obtain such undertakings as the Secretary may consider appropriate to assure that the property will be used, to the maximum practicable extent, in the provision of housing and related facilities to be occupied by families or individuals of low and moderate income for a period of not less than thirty years. If during such period the property is used for any purpose other than the purpose for which it was disposed of it shall revert to the United States (or, in the case of leased property, the lease shall terminate) unless the Secretary and the Administrator, after the expiration of the first twenty years of such period, have approved the use of the property for such other purposes.

Although section 414 was repealed in 1983, Congress provided that the terms of section 414 continue with regard to requests for transfer of surplus property that were made prior to enactment of the repealing statute. Supplemental Appropriations Act of 1984, Pub. L. No. 98–181, 97 Stat. 1153, 1175 (1983). Congress also provided that "section 414(b) . . . shall continue to apply, where applicable, to all property transferred by either Secretary pursuant to section 414." *Id.*

### B. *San Patricio Property*

Between 1940 and 1943, the United States acquired through condemnation proceedings 52.86 acres of land located in the San Patricio area of San Juan, Puerto Rico. The property was used by the Department of Navy for defense housing purposes. In 1970, a report was filed by the Department of Navy with the GSA declaring the 52.86 acres of land, with improvements, to be surplus property. The improvements on the property consisted of 206 buildings, including 194 duplex housing units, miscellaneous structures, paved streets, gutters, sidewalks and utilities. Most of the buildings had been erected in 1941 and were in poor condition by 1970.

In a letter to the GSA Administrator, dated June 29, 1972, HUD formally requested the transfer of the 52.86 acres of San Patricio property for sale to the Commonwealth of Puerto Rico pursuant to section 414 of the Housing and Urban Development Act of 1969, 40 U.S.C. § 484b. Letter for Arthur F. Sampson, Administrator, GSA, from Samuel C. Jackson, Assistant Secretary for Community Planning and Management, HUD (June 29, 1972) ("Jackson June 29, 1972 Letter"). The letter listed certain information regarding the proposed sale as required

by GSA's regulations. As stated in those regulations, certain information was needed for use by "GSA in preparing and submitting a statement relative to the proposed transaction to the Senate and House Committees on Government Operations prior to the transfer of the property to HUD." 41 C.F.R. § 101–47–308–6(f)(7) (1974).

The information submitted in HUD's Jackson June 29, 1972 Letter included, in relevant part, "what reversionary provisions [would] be included in the deed." 41 C.F.R. § 101–47–308–6(f)(7) (1974). The letter stated:

> Section 414(b) does not require that reversionary provisions be included in the deed when the sale is to a public body; however, language will be included which will make clear the purposes for which the land is to be used.

Jackson June 29, 1972 Letter at 2. Also included in the letter was a summary of the proposed development plan for the property.

> The proposed development is medium to high density residential consisting of approximately 1,920 housing units, with supporting community and commercial facilities. Total Project cost is estimated to be $75 million. Housing is to be developed with Federal assistance under HUD's Public Housing, Section 235 and Section 236 Programs. . . .
>
> It is estimated that construction can begin within two years of the date of sale of the property. Planning and development of a project of this size will require several years, therefore a completion date for all construction is not estimated.

*Id.*

The letter also stated that HUD had determined the property's fair value for use in providing the required housing to be $1,655,000 and that HUD proposed to sell the property at that price. *Id.* at 1. The estimated fair market value of the San Patricio property as of July 20, 1972, was $2,964,500. Disposal Plan, Real Property and Related Personal Property (July 20, 1972).

GSA concluded that the proposed transfer to HUD was consistent with the requirements of surplus property sales. GSA notified HUD of the approval and that the congressional committees would have to review HUD's disposal plan. Letter for Office of Real Property, HUD, from Richard W. Austin, Assistant Commissioner, Office of Real Property, GSA (Aug. 7, 1972).

In a letter to the Chairpersons of the United States House and Senate Committees on Government Operations, the GSA Administrator advised Congress of the proposed transfer to HUD and subsequent sale to the Commonwealth of Puerto

Rico of 51.887 acres of San Patricio property.[2] Letters for Honorable Chet Holifield and Sam J. Ervin, Jr., Chairmen, House and Senate Committees on Government Operations, from Arthur F. Sampson, Acting Administrator, GSA (Aug. 25, 1972) ("Holifield & Ervin Aug. 25, 1972 Letters"). The letters, which were identical, disclosed virtually the same information that the Jackson June 29, 1972 Letter had provided to GSA. As for the reversionary provision, however, GSA simply stated that "[c]onveyances under Section 414 of the Housing and Urban Development Act of 1969, as amended, do not require reversionary provisions in the deed when disposal is to a public body." *Id.* at 2. GSA did not notify Congress that HUD nevertheless planned to convey the land conditionally.

In a letter dated October 17, 1972, GSA assigned to HUD 51.887 acres of the land with improvements ("the San Patricio property") for sale to the Commonwealth of Puerto Rico as HUD had previously requested. Letter for Samuel Jackson, Assistant Secretary for Community Planning and Management, HUD, from Albert Wilson, Director, Real Property Division, GSA (Oct. 17, 1972). Although GSA demanded in the letter that the sale to Puerto Rico be made subject to certain conditions, no mention was made of a need for a reversionary provision in the deed or that the land be conveyed conditionally as to its use. GSA did request that it be furnished with copies of the deed of conveyance.

In a deed dated September 27, 1974, HUD sold the San Patricio property to CRUV for $1,655,000, to be paid over an eight year period with the unpaid balance bearing an interest per annum of eight and one fourth percent. *See* Deed at 8–9. As set forth in the deed, the conveyance of the San Patricio property was premised upon certain conditions that were binding on CRUV and its successors. Some of the conditions relevant to the issues addressed here are set forth as part of the deed's paragraph entitled "Seventh" under the category "TERMS AND CONDITIONS." Five types of "Terms and Conditions" are listed in paragraphs lettered from "A" to "E." Some of the terms and conditions in category "E" are pertinent and read as follows:

> E. [CRUV] proposes to provide housing under the terms of the United States Housing Act of Nineteen Thirty Seven as amended, . . . so as to enable families of low and moderate income and the elderly or handicapped, to live in decent homes now beyond their means.

---

[2] The letter states that the property to be transferred consist of 51.887 acres of land with improvements. Almost an acre (*i.e.* .973 ) of the 52.86 acres initially requested by HUD was transferred to the Federal Aviation Administration ("FAA") instead of HUD. Accordingly, HUD received 51.887 acres of the San Patricio property for sale to CRUV. *See* Letter for Samuel Jackson, Assistant Secretary for Community Planning and Management, HUD, from Albert Wilson, Chief, Real Property Division, GSA (July 21, 1972); Segregation, Sale, Conveyance and Mortgage Deed at 6–7 (Sept. 27, 1974) ("Deed") (attached as Exhibit A).

After the sale to CRUV, a discrepancy between the deed and Registry of Property in Puerto Rico was discovered as to the acreage of the property conveyed. In a qualifying deed, dated February 25, 1975, the parties agreed to adopt the acreage figures appearing in the Registry (54.06 total acreage, 2.193 acreage given to the FAA, leaving a total acreage of 51.867 conveyed to CRUV). *See* Aclaratory Deed (Feb. 25, 1975).

TO HAVE AND TO HOLD the [San Patricio] property provided, however, that this Deed is made and accepted upon the following conditions subsequent, which shall be binding upon and enforceable against [CRUV], its successors or assigns, as follows:

One.— That for a period of forty (40) years from date of this deed, the [San Patricio] property herein conveyed shall be utilized for the development and rental of low-rent housing to be occupied by families or individuals of low or moderate income and for such other purposes as may be defined from time to time by the United States Department of Housing and Urban Development.

Two.— That during the aforementioned period of forty (40) years [CRUV] will resell, lease, mortgage or encumber, or otherwise dispose of the [San Patricio] property or any part thereof or interest therein only as the United State [sic] Department of Housing and Urban Development or its successors, in accordance with the then-existing regulations, may authorize in writing.

. . . .

Five.— In the event of a breach of any of the conditions set forth above, whether caused by the legal or other inability of [CRUV], its successors or assigns, to perform any of the obligations herein set forth, all right, title, and interest in and to the [San Patricio] property shall, at the option of the United States of America, revert to and become the property of the United States of America; unless the [Secretary] and the Administrator of General Services, after the expiration of the first twenty (20) years of such period, approve the use of the property for such other purpose[s]; and the United States of America shall have an immediate right of entry thereon, and [CRUV], its successors or assigns, shall forfeit all right, title, and interest in and to the [San Patricio] property and in any and all of the tenements, hereditaments, and appurtenances thereunto belonging . . . .

Deed at 10–12.

Thereafter, in the deed's paragraph entitled "Ninth," CRUV made an additional representation concerning the construction of the low and moderate income housing on the San Patricio property:

> [CRUV] agrees that it will start construction of the proposed facility within three years following the execution of this Deed and will keep such developer activity within a reasonable period of time thereafter, now estimated to be ten years. Construction of initial and subsequent phases of the development of the property will proceed only upon prior approval of the United States Department of Housing and Urban Development.

*Id.* at 14.

After purchasing the San Patricio property, CRUV never developed the land as originally planned. Documents supplied to us by HUD and GSA contain references to a variety of problems faced by CRUV in its efforts to develop the property. For example, in a HUD memorandum dated February 10, 1987, the first 10 years of problems are summarized.

> No real acceptable solution has been reached in 10 years. Over this time, the circumstances have changed as the Section 8 New Construction Program was terminated. Alternate sources of funds for construction needed to be developed.
>
> . . . .
>
> After 10 years, nothing had been built because of a variety of reasons: lack of development money, utilities problems, neighborhood opposition, bureaucratic inertia, and changes in administration.

Memorandum for Thomas T. Demery, Assistant Secretary for Housing-Federal Housing Commissioner, HUD, from R. Hunter Cushing, Deputy Assistant Secretary for Multifamily Housing Programs, HUD (Feb. 1987)[3] ("Cushing Memorandum").

The documents reveal that a number of alternative development proposals were submitted by CRUV to HUD. Some proposals were accepted and some were rejected by HUD.[4] The documents also show that some proposals were prompted by threats of instituting a reversionary proceeding. The Cushing Memorandum states:

---

[3] The handwritten date of "Feb. 5, 1986" on the memorandum appears to not reference the date of the memorandum. The receipt stamp on the bottom of the memorandum appears to indicate a date of "February 10, 1987." In addition, the memorandum references events occurring subsequent to February 5, 1986.

[4] Apparently, efforts to develop the property were unsuccessful in part because of the amount of HUD subsidy that would have been required to support the low and moderate income housing proposals. *See* Letter for Karen Popp, Attorney-Advisor, Office of Legal Counsel, from Nelson A. Diaz, General Counsel, HUD at 3 (July 27, 1995) ("Diaz July 27, 1995 Letter").

> The sale documents and deed required development activities to begin in 3 years and be completed in 10 years, or the property was subject to a right of reversion in the United States. As the 10-year period approached without any development, Commonwealth and HUD officials met on numerous occasions to try to develop a plan for the site in order to avoid reversion.

> When Puerto Rican officials understood we were serious about starting the reversion process [after 10 years], they negotiated a new plan to develop half of the site with [Low and Moderate Income Housing] and the other half with Coast Guard family housing for some of its enlisted personnel. Half of the proceeds of the Coast Guard sale were earmarked to assist the [Low and Moderate Income Housing] part of the site. Puerto Rico developed a plan for the [Low and Moderate Income Housing] half and selected developers for the development. The Coast Guard secured funding for its half, signed a contract to buy it, and put down a $50,000 deposit.

> However, the plan never went forward. There was a change in administrations in Puerto Rico, and the new officials decided to rezone the site to park and recreational use to block development of any type.

> In December 1985, Puerto Rico, at our request, submitted another proposed plan for the site but it was unacceptable to HUD.

*Id.* at 1, 4.

The Cushing memorandum also made reference to a GSA letter dated March 7, 1986, which requested that HUD either facilitate the development of the property or exercise its reversionary rights under the deed. Letter for Angelo Sciosia, Director, Office of Surplus Land, HUD, from James J. Buckley, Acting Assistant Commissioner, Office of Real Property, GSA (Mar. 7, 1986). As set forth in that letter, GSA inspected a portion of the property in January 1985 and found that the property had not been developed. [5]

In addressing a then-current CRUV development proposal, the Cushing Memorandum discussed the alternative of pursuing the reversionary proceeding and the possible consequences.

---

[5] HUD advised CRUV in a letter dated June 26, 1986, that a request had been made of the HUD General Counsel to commence the reversion process. Letter for Jose Ariel Nazario, Secretary, Housing Department, Commonwealth of Puerto Rico, from R. Hunter Cushing, Deputy Assistant Secretary, Multifamily Housing Programs, HUD (June 26, 1986).

> This proposal will develop 450 new units at San Patricio, and 300 new units in Rio Bayamon — a noteworthy achievement.
>
> Our alternative is to refuse to modify our last position and continue with reversion which will entail protracted litigation during which no new units will be built. Furthermore, because of numerous legal interpretaters, our success in litigation is not assured. However, the Commonwealth seems to be willing to expend a lot of political currency to keep us at the negotiating table.
>
> . . . .
>
> Since we have never before done a section 414 reversion, we expect it will take several years.

*Id.* at 2.

In the end, HUD chose to pursue negotiating alternative proposals for the development of the property instead of seeking a reversion of the property. In a letter dated March 17, 1987, HUD approved the 1986 plan to develop 450 units on the San Patricio property and to sell other property to the United States Coast Guard. HUD advised CRUV that "[w]e will suspend the reversionary process begun earlier." Letter for Jose Ariel Nazario Alvarez, Secretary, Housing Department, Commonwealth of Puerto Rico, from Thomas T. Demery, Assistant Secretary for Housing-Federal Housing Commissioner, HUD at 2 (Mar. 17, 1987).

The 1986 plan approved by HUD involved the sale of the San Patricio property to a developer in Puerto Rico, the RECA Development Corporation ("RECA"). Problems arose in completing the plan as it related to the Coast Guard property and because of the substantial increase in fair market value enjoyed by the San Patricio property.[6] The delay from these problems extended into the early 1990's.

In 1991, CRUV was dissolved and the Office for the Liquidation of Assets ("OLA") in Puerto Rico acquired CRUV's debts and assets, including the San Patricio property.[7] *See* Proposal at 6. OLA's Special Trustee was tasked with the duty of liquidating CRUV's obligations in an effort to meet its debts. The Puerto Rico Department of Housing ("Vivienda") assumed CRUV's govern-

---

[6] In 1987, the San Patricio property was valued at $6.2 million for use in providing the required housing. A 1994 appraisal found the value for use at $10 million and without the restrictions at $20 million. *See* Puerto Rico Dept. of Housing, Proposal for the Disposition of Finca San Patricio for the Creation of a "Jibaro Housing Trust Fund" at 18–19 (Aug. 17, 1994) ("Proposal"). The increase in value has been attributed to the location of the property and inflation. The San Patricio property is on a bluff within walking distance of many existing urban facilities, services and employment opportunities and the most expensive housing development in Puerto Rico (single family homes in the $2 million plus range). *Id.* at 18.

[7] CRUV had made full payment of the purchase price plus interest for the San Patricio property by March, 1983. In the end, CRUV paid a total sum of $1,954,253.45 for the property. *See* Memorandum for Angelo M. Sciosia, Director, Office of Surplus Land & Housing, HUD, from Rafael Pieras-Lombardero, Area Counsel, HUD, Re: Status Report San Patricio Naval Reservation Project No. N–PR451B (Apr. 20, 1983).

mental responsibility in the area of developing affordable housing in Puerto Rico. *Id.* at 6–10.

OLA and Vivienda assumed the responsibility of facilitating the development of the San Patricio property. Negotiations with RECA continued. In 1992, an "Agreement to Sell and Purchase San Patricio Property" (the "Agreement") was drafted and allegedly agreed to by representatives of RECA, Vivienda, and HUD. The 1992 transaction contemplated a sale of the San Patricio property free of the restrictive use in providing low and moderate income housing with the proceeds being used by Vivienda to build the housing elsewhere.

The proposed transaction was never completed. HUD and Puerto Rico have taken the position that the Agreement is not valid. HUD's position is premised upon the assertion that GSA's approval for the sale is required under the deed. Puerto Rico has asserted that OLA's approval is also required. *See* Letter for Marcia Hale, Co-Chair, Interagency Working Group on Puerto Rico, Department of Commerce, from Nelson Diaz, General Counsel, HUD at 2 (Feb. 9, 1995) ("Diaz Feb. 9, 1995 Letter"). RECA filed an action on September 26, 1994 in the Superior Court of Puerto Rico seeking injunctive and declaratory relief. *Id.* The litigation is pending. [8]

As the dispute with RECA continued in Puerto Rico, Vivienda submitted a proposal to HUD for the sale of the San Patricio property. The proposal envisions a two step sale. In the first step, Vivienda and OLA would enter into a binding agreement for Vivienda to acquire the San Patricio property with its current deed restriction and to pay OLA for the current value of such use. Vivienda and OLA would forward a copy of the agreement to HUD. After obtaining GSA approval, HUD would authorize the removal of the deed restrictions on the use of the property. Upon removal of the deed restrictions, Vivienda would issue a Request for Proposals for the development of the site and sell the property at its fair market value. [9] The proceeds of this sale would be used by Vivienda, in part, to provide low and moderate income housing in other parts of Puerto Rico. Part of the money would be used to pay the expenses of Vivienda and OLA. The two-step approach in this transaction is required because OLA's authority is limited to liquidating CRUV's assets. *See* Diaz July 27, 1995 Letter at 1 n.1; Letter for Teresa Wynn Roseborough and Karen Popp, Office of Legal Counsel, Department of Justice, from Emily C. Hewitt, General Counsel, GSA at 2 n.3 (June 20, 1995) ("Hewitt June 20, 1995 Letter"); Vivienda Proposal at 35–52.

After consideration of Vivienda's proposed transaction, HUD and GSA arrived at differing views as to whether the United States could legally approve the transaction. As set forth below, we outline those differing views and address the legal issues under section 414 raised by the proposed transaction.

---

[8] This Opinion does not address the questions presented in the 1992 litigation.

[9] Earlier this year, HUD learned from Puerto Rico that RECA has indicated a willingness to purchase the San Patricio property. *See* Diaz Feb. 9, 1995 Letter. This result could resolve the pending litigation. *Id.*

## C. *The Positions of HUD and GSA*

HUD takes the position that the proposed transaction is lawful under section 414 of the Housing and Urban Development Act of 1969, 40 U.S.C. § 484b. GSA claims that the proposed transaction is not authorized by section 414.

Conceding that section 414 requires that the San Patricio property be "used" to provide low and moderate income housing, HUD first argues that the proposed transaction satisfies the "use" requirement. Specifically, HUD claims that selling the property at its fair market value and using the proceeds to build housing elsewhere is a proper "use" of the property in providing the required housing. Relying on this expansive view of the statutory term "use," HUD concludes that the proposal would not change the "use" of the property, only the method by which the property is used. *See* San Patricio, Summary of HUD Legal Position, Attachment to Letter for Honorable Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Emily C. Hewitt, General Counsel, GSA (Apr. 11, 1995).

GSA rejects the notion that the proposed sale is not a change in use of the property. GSA views the statutory term of "use" as requiring that the property be physically used by developing the required housing on the actual premises.

HUD next asserts that even if the proposed transaction constitutes a change in the property's use, HUD and GSA are authorized to approve such change under the terms of the deed, which are not inconsistent with section 414. As outlined above, the deed specifies in Condition Five of paragraph Seven that, after twenty years, HUD and GSA could approve a change in the use of the property. The same provision of the deed allows for reversion of the property at the United States' option in the event housing is not provided for the first forty years after conveyance to CRUV. Section 414, however, does not explicitly state that in a conveyance to a public body the United States can authorize a change in the use of the property. Subsection (b) of the statute does specify that in a sale to a non-public body the property shall revert back to the United States if the property is not used in providing the required housing, unless after twenty years a change in use has been approved by GSA and HUD.

HUD construes the statute as leaving the government with the option to insert a reversionary requirement and a provision allowing for a change in use when the sale is to a public body. HUD contends that the existence of section 414(b) simply makes the reversionary requirement mandatory for all sales to non-public bodies.

GSA views the explicitness of section 414(b) somewhat differently and finds "some" merit in the claim that "Congress's omission from subsection (b) of public bodies signifies a specific and purposeful limitation of the authority to approve changes in use." Letter for Teresa Wynn Roseborough and Karen Popp, Office of Legal Counsel, from Emily C. Hewitt, General Counsel, GSA at 1 n.1 (Aug. 9, 1995) ("Hewitt Aug. 9, 1995 letter"). GSA concedes, however, that the statute is ambiguous and that the legislative history does not lend support to this interpre-

tation. Citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 843 n.9 (1984), GSA joins HUD in concluding that considerable weight should be accorded to GSA's interpretation of the statute through its regulations.

GSA asserts that the current regulation, 41 C.F.R. § 101–47.308–6(l) (1994), which was adopted in 1982, is controlling because approval of the proposed trans-action must comply with Condition Two of paragraph Seven of the deed. As set forth above, that condition requires HUD's approval "in accordance with the then-existing regulations," for a resell of the property. The current regulation at issue addresses the authority to change the use of the property in sales to non-public bodies. The regulations do not specify that the authority exists in sales to public bodies. GSA argues that the regulation establishes that GSA has interpreted section 414(b) as limiting the authority to approve changes in use to properties transferred to non-public bodies.

HUD disagrees. The previous version of the regulation at issue, which was adopted in 1971, did not limit the power to change the use to properties transferred to non-public bodies. On its face, the regulation appeared to recognize the author-ity to change the use of the property in any type of sale under section 414 and to require a reversionary right in all deeds of conveyance. HUD contends that this earlier regulation is evidence that GSA interpreted section 414 as HUD now does — the statute leaves the government with the option to insert a reversionary requirement and a provision allowing for a change in use when the sale is only to a public body. HUD also cites to the letters GSA wrote to Congress and HUD in approving the San Patricio transfer as further support of this interpretation. *See* letters *supra.* [10]

Finally, the parties addressed GSA's claim that even if the deed's provision for change of use authority is lawful under section 414, such approval authority is conditioned upon compliance by CRUV with the use requirements during the twenty year period. Stated differently, GSA argues that GSA and HUD may ap-prove a change in the use of the property only if CRUV has been in compliance with the deed's conditions. GSA relies on the language in section 414, analogous real property disposal regulations and policy considerations in support of its argu-ment.

In rejecting GSA's argument, HUD relies on the plain language of the statute, regulations and deed. HUD also argues that, in any event, CRUV's noncompliance was caused by exceptional circumstances and should not be a basis for denying a change in use. According to HUD, CRUV and its successor were unable to develop the property as required by the deed of conveyance despite its best efforts. These failures were caused in part by the lack of HUD funding required for the development.

---

[10] As for the 1982 change to the regulations, HUD rejects GSA's assertion that the change demonstrates a different GSA interpretation of section 414. HUD claims that the amended regulation simply adopted a rule more consistent with the statute: in a conveyance to a non-public body, the reversionary requirement is mandatory.

## II. Legal Analysis

### A. *Whether the Proposed Transaction Constitutes A Change In Use of the San Patricio Property*

The initial question presented is whether the proposed transaction constitutes a change in use of the property under section 414 and the deed. Section 414 authorized GSA to transfer surplus property to HUD "for sale or lease by him at its fair value for use in the provision of housing to be occupied by families or individuals of low or moderate incomes. . . . Any such sale or lease of surplus land shall be made only to (1) a public body which will use the land in connection with the development of a low-rent housing project." [11] In the sale of the property to CRUV, the deed required that the property be "utilized for the development and rental of low-rent housing to be occupied by families or individuals of low or moderate income." Deed at 10–11. HUD claims that the proposed transaction is not a change in the use of the property because the property will be "used" as an asset to sell at fair market value in order to raise money to build the housing on different property in Puerto Rico. We do not believe that HUD is correct.

> The plain meaning of the phrase "for use in the provision of housing" convinces us that Congress was referring to the physical use of the property — that is, that Congress intended as an initial matter that the property be used as the premises upon which the required housing must be built. Indeed, the legislation authorized HUD to sell the property below fair market value because of the use to which the property would be put. The discounted value was determined by the "use" of the property as the premises upon which the low and moderate housing would be built. Adopting HUD's construction that use in the provision of housing includes use as an asset to finance the construction of housing would belie the rationale of the statute's provision.

The primary guide to statutory interpretation is the plain meaning of the text. As stated by the Supreme Court in *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989):

> The plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571

---

[11] Section 414(a) was amended by deleting the latter part of this phrase and currently reads in relevant part: "for sale or lease by either Secretary at its fair value for use in the provision of housing to be occupied predominantly by families or individuals of low- or moderate-income."

(1982). In such cases, the intention of the drafters, rather than the strict language, controls.

This is not the "rare case[ ]" where the result that follows from the statute's text is "demonstrably at odds" with its underlying congressional purpose. *See Griffin*, 458 U.S. at 571. To the contrary, adopting the plain meaning of the language furthers the congressional intent of selling property at a discount because of its restricted usage. The legislative history supports the conclusion we have reached from a plain reading of the statute.

The House Committee on Banking, Housing, and Urban Affairs explained that the rationale for selling the property at a discounted value was to attract developers who could build housing on the property.

> The advantage to a developer in obtaining land through section 414 lies in the statute's authorization for the price of the land to be set by the Secretary at "fair value for use" rather than "fair market value."

H.R. Rep. No. 95–871, at 47 (1978).

In justifying the sale at a discount, the Senate Committee on Banking and Currency exhibited an expectation that the property itself would be developed:

> Existing law governing the disposal of surplus Federal land permits the Administrator of General Services to assign surplus real property to the Secretary of the Interior or the Secretary of Health, Education, and Welfare for subsequent sale or lease at less than market value to nonprofit organizations, the States or their subdivisions. Such property must be used for recreational, public health, or educational purposes. This section would allow a similar sale or lease of surplus land at reduced prices where the land is to be used for the development of low- and moderate-income housing. The price to be paid for all property (or the lease thereof) being so utilized shall be equal to the fair value (or fair rental value if it is to be leased) of such plot as determined by standard appraisal techniques, considering the use to which the property is to be put by the party acquiring the same. . . .
>
> Authority to provide sites as [sic] a reduced price for low- and moderate-income housing would not necessarily have an adverse budgetary impact since the amount of subsequent Federal subsidy required for this housing would be lessened due to lower initial land costs to the developer.

S. Rep. No. 91–392, at 35–36.

Subsequent materials also refer to the physical use of the property in explaining section 414. For example, in addressing the 1970 amendment to section 414, the House Committee on Banking, Finance, and Urban Affairs explained that section 414 authorized GSA to dispose of surplus "land" to HUD "for the construction of low- and moderate-income" housing. House Comm. on Banking, Finance, and Urban Affairs, 95th Cong., *Basic Laws and Authorities on Housing and Community Development* 23 n.1 (Comm. Print 1978).

In a joint explanatory statement of the House and Senate managers of the Committee of Conference, section 414 was described as providing property "at its fair value for use as housing . . . . [T]he disposition of federal surplus property is for the purpose of making land available for low and moderate income housing." House Subcomm. on Housing and Community Development, 95th Cong., *Compilation of the Housing and Community Development Amendments of 1978, Joint Explanatory Statement of the Managers of the Committee of Conference* 110 (Comm. Print 1978) ("Explanatory Statement of Managers"); *see also* H.R. Conf. Rep. No. 95–1792, at 81 (1978).

The legislative history plainly shows that in adopting section 414 Congress intended for the surplus property to be developed with the required low and moderate income housing. This history and the plain meaning of the statute belie any claim that the phrase "use in the provision of housing" includes a developer's sale of the property at a fair market value.

In addition, if "use in the provision of housing" included a sale at fair market value by the developer, the program established by section 414 would accomplish nothing more than what GSA could have done alone. If authorized, GSA would certainly have the ability to negotiate the sale of federal property at fair market value and to earmark the proceeds for housing without HUD and the developer as intermediaries to the sale. Such intermediaries would create inefficiencies and unnecessary expense. Indeed, in the end, the statute was repealed and the program abolished due, in part, to the recognition that GSA could sell surplus property directly to a developer for the construction of housing.

> Since its inception, this program has been infrequently used. Fourteen properties have been transferred since 1970. Nine additional properties are in the pipeline. This limited activity over such a long period does not justify the costs involved — staff, travel, etc. — in maintaining the program. Moreover, the program is administratively inefficient, since it interjects HUD and FmHA between GSA and the ultimate purchaser/lessee of the property involved.

S. Rep. No. 98–142, at 23 (1983)

Our conclusion is also supported by the plain meaning of section 414(b). As quoted above, section 414(b) requires that HUD assure that the property be "used" in providing housing to be occupied for a period of forty years (thirty as amended) by families of low and moderate income and that a reversion occur if the property is not so used. Certainly the property would have to be physically used during this period; disposing of the property could not satisfy the forty/thirty year requirement. Nor could the property be reverted back to the United States if it had been "used" in a sale at fair market value.

Even if the statute were ambiguous on this issue, GSA, the agency charged with administering the statute, has interpreted "use in the provision of housing" to require that the land be developed with the necessary housing. Regulations adopted by GSA mandate that when HUD submits a request to GSA for the transfer of surplus property for sale to another entity, HUD must specify:

> (5) [h]ow the property is to be used (i.e., single or multifamily housing units, the number of housing units proposed, types of facilities, and the estimated cost of construction); (6) [a]n estimate as to the dates construction will be started and completed; and (7) [w]hat reversionary provision will be included in the deed . . . .

41 C.F.R. § 101–47.308–6(f) (1994). HUD complied with these regulations in the conveyance at issue here. Likewise, the deed's requirement that the property be "utilized for the development and rental of low-rent housing," appears to contemplate the physical use of the property. [12] Because the proposed transaction involves the sale of the property to raise cash with which housing would be built elsewhere, we believe such use constitutes a change under the terms of section 414 and the deed.

---

[12] Indeed, in a different context, HUD has taken the same position we have reached: permitting a developer to sell the property at fair market value and using the proceeds to provide the required housing elsewhere is a change *in use of the property under the deed.* In 1992, an Agreement to sell the San Patricio property was allegedly agreed to by representatives of RECA, Vivienda, and HUD. The proposed sale, like the one at issue here, involved selling the property at fair market value with the proceeds going toward the building of low and moderate housing elsewhere in Puerto Rico. HUD took the position that the Agreement was not valid.

HUD's assertion was premised upon Condition Five of paragraph Seven of the deed, which requires the approval of GSA and HUD where, after twenty years, CRUV or its successor seeks to use the property for a purpose other than the provision of low or moderate income housing. *See* Deed at 10, ¶7(E)(One) and p. 11–12, ¶7(E)(Five). In relying on this condition of the deed, the crux of HUD's position is that the proposed transaction is a change in use of the property — that is, the property is not being used to provide the required housing. Otherwise, only Condition Two, Seventh paragraph, would apply to the transaction. Condition Two requires only HUD's approval if the property is resold for the purpose of providing the required housing. *Id.* at 10–11, ¶7(E)(Two); *see also* Letter for Karen Popp, Attorney-Advisor, Office of Legal Counsel, from Nelson A. Diaz, General Counsel, HUD at 4 n.1 (June 19, 1995) ("Diaz June 19, 1995 Letter") ("Paragraph No. 2 in the deed . . . only requires HUD approval of a sale of San Patricio by CRUV because a sale of the property, by itself, does not constitute a change in use as long as housing continues to be planned for the property.")

Indeed, HUD also concedes in the June 19, 1995, letter that the proposed transaction at issue here constitutes a change in the use of the property, requiring GSA and HUD approval. Diaz June 19, 1995 Letter at 4 ("All HUD proposes to do at this time is to implement [Condition Five] of the deed so that a sale and change in use of the San Patricio property can be approved by GSA and HUD.").

## B. *Whether the United States May Approve A Change In Use of the San Patricio Property*

Having concluded that the proposed transaction constitutes a change in use of the property, we now turn to the remaining issue in dispute: whether section 414 permits a change in use of the property where the conveyance was to a public body.

HUD and GSA agree that the conveyance to CRUV was a sale to a public body and, consequently, that section 414(b) does not apply to the San Patricio conveyance. We also agree with these conclusions. [13] By its plain meaning, section 414(b) is limited to a conveyance made to a private entity. [14] Indeed, the repealing statute recognizes that section 414(b) applies only to qualifying conveyances. Pub. L. No. 98–181, 97 Stat. 1153, 1175 (1983); *see* discussion *supra* p. 4.

The explicitness of section 414(b)'s limitations as to private entity conveyances and the corresponding silence in the statute as to dispositions to public bodies create an issue of interpretation. Is a subsequent change of use statutorily prohibited when a public body purchased the property at fair market value for use in the provision of low and moderate income housing?

Here, the principle of *expressio unius est exclusio alterius* is not helpful in determining legislative intent. Under this maxim, the expression of one thing is the exclusion of another. *See, e.g., United States v. Wells Fargo Bank*, 485 U.S. 351, 357 (1988). Applying this principle, one must conclude that reversion is required as to the private entity and optional as to the public body, and that the right to change the use of the property is permitted for a private entity and excluded as to the public body. These two conclusions, however, are mutually exclusive. If a change of use is not permissible as to public body conveyances, the conditions would run in perpetuity and a right of reverter would be required in the deed to enforce the perpetuity provision. Stated differently, a reversionary provision would be mandated in every deed of conveyance to a public entity, a concept that would be inconsistent with the application of the *expressio unius* maxim.

GSA concedes that the legislative history does not "lend specific support to [the] interpretation of the statute" reached by application of the *expressio unius* principle. We agree that the legislative history of section 414 is scant and certainly not illuminating as to this question. What little legislative history does exist is

---

[13] By its plain meaning, the last sentence of the original and first amended versions of section 414(b), which required notice to the congressional committees, applied to all surplus property sales. Our discussion of section 414(b) here is limited to the first two sentences of these earlier versions, which after the 1978 amendment, constituted the whole section.

[14] The legislative history does not detract in any way from the plain meaning of section 414(b). *See* S. Rep. No. 98–142, at 23 ("Section 414 presently provides that land conveyed to a private entity will revert to the United States if it is used for other purposes within thirty years (twenty years with Federal approval) after its transfer for use as low-and moderate-income housing."); H.R. Rep. No. 95–871, at 95 (414(b) applies "in the case of disposition of surplus property to an entity other than a public body"); Explanatory Statement of Managers at 225 (§ 414(b)) makes specific requirements with respect to a conveyance "to an entity other than a public body").

ambiguous. For example, an earlier version of section 414(b), as it appeared in S. 2864, 91st Cong. (1969), provided:

> As a condition to any sale or lease of excess land under this section to a purchaser or lessee *other than a public body*, the Secretary shall obtain such undertakings as he may consider appropriate to assure that the property will be used in the provision of rental or cooperative housing to be occupied by families or individuals of low or moderate income for a period of not less than twenty years. The Secretary shall notify the Committees on Banking and Currency of the Senate and House of Representatives whenever any excess land is sold or leased by him pursuant to the authority of this section.

115 Cong. Rec. 26,728–29 (1969) (emphasis added).

In explaining the provision in S. 2864, the Senate Committee on Banking and Currency stated:

> Also, *any purchaser* under [section 414] must commit the property for use in low- and moderate-income rental or cooperative housing for at least 20 years. Notification of all sales or leases under this section shall be given to the Committees on Banking and Currency of the Senate and House of Representatives.

S. Rep. No. 91–392, at 36 (emphasis added). The Committee also stated:

> Subsection (b) would require, as a condition to *any sale or lease* of excess land, that the Secretary obtain such undertakings as he may consider appropriate to assure that the property will be used in the provision of rental or cooperative housing to be occupied by families or individuals of low or moderate income for a period of not less than 20 years. The Secretary must notify the Senate and House Committees on Banking and Currency whenever any excess land is sold or leased pursuant to this section.

*Id.* at 53 (emphasis added); 115 Cong. Rec. 26,707 (1969).

The Senate Committee report also contained a section on the views of Senator John Tower, which stated in relevant part:

> Section [414] presents yet another problem. Pursuant to that section, governmental lands may be sold to *individuals* at a cost below fair market value for use in low-cost housing. This conveyance is in fee and there is no reversion if the land is not used for low-cost

housing after the initial 20 years. In reality, the purchaser is getting a windfall; the price which he pays the Federal Government could in many instances be much below the actual value of the land and after 20 years he can use it for any purpose he so desires. The Federal Government must pay fair market value when it acquires land, and it should receive the same when it sells lands.

*Id.* at 55 (emphasis added).

Thereafter, the proposed legislation was amended to require a forty year usage of the property with a mandatory reversion for noncompliance, but to permit a change in use after twenty years. This version of section 414(b) was eventually approved by Congress. H.R. Conf. Rep. No. 91–740, at 23. The report explained:

> The conference substitute retains the Senate provisions with amendments . . . (2) authorizing the Secretary of HUD to assure that the property will be used for low- and moderate-income housing for not less than 40 years, but permitting a changed use after the initial 20 years upon approval of the Secretary.

*Id.* at 35.

In a section by section summary of the adopted legislation, the House Committee on Banking and Currency described section 414(a) and then stated: "Subsection (b) requires that, as a condition to *any such sale or lease* of surplus real property, the Secretary must obtain" certain undertakings. House Comm. on Banking and Currency, 91st Cong., *Housing and Urban Development Act of 1969, Public Law No. 91–152 and Section-By-Section Summary* 39 (Comm. Print 1969) (emphasis added). It is unclear what is meant by "any such sale." The phrase could reference the whole discussion relating to a section 414(a) conveyance or the preceding sentence, which addresses only sales to private entities. The previous sentence states:

> Prior to any sale or lease to a purchaser other than a public body the Secretary must notify the governing body of the locality where the property is located and no sale or lease may be made if, within 90 days, the local governing body formally notifies the Secretary that it objects to the proposed sale or lease.

*Id.*

It is clear that the congressional statements highlighted above "were obviously not made with [our] narrow issue in mind and they cannot be said to demonstrate a Congressional desire." *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers,* 325 U.S. 161, 168–69 (1945). At times, some of the statements appear to suggest that section 414(b) applies to all sales under section 414. These state-

ments, however, are difficult to reconcile with the plain meaning of section 414(b) and the other legislative history. In addition, one of the concerns addressed by section 414(b)'s reversionary requirement and corresponding change in use provision, as explained by Senator Tower, was that "individuals" not receive an unnecessary windfall. One could construe this as an indication that Congress was not concerned with a windfall bestowed upon a public body.

Without clearer direction from Congress, we agree with HUD and GSA that the statute and its legislative history are sufficiently ambiguous to make it appropriate to consider what, if any, interpretation has been provided by the agency charged with administering the statute.

> The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.

*Chevron U.S.A. Inc.*, 467 U.S. at 842–43 (footnotes omitted) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). The permissibility of an agency's interpretation depends upon whether the interpretation is "reasonable." *Id.* at 845.

On April 29, 1971, the Administrator of GSA issued regulations implementing the program established under section 414. In relevant part, the regulations stated:

> If the property conveyed under section 414(a) of the 1969 Housing Act, as amended, is used for any purpose other than the purpose for which it was sold or leased within a period of not less than 40 years of the conveyance, it shall revert to the United States (or, in the case of leased property, the lease shall terminate) unless the Secretary and the Administrator of General Services, after the expiration of the first 20 years of such period, approve the use of the property for such other purpose.

41 C.F.R. § 101–47.308–6(l) (1974). The regulations also required that in any HUD request to GSA for the transfer of surplus property, HUD had to specify "what reversionary provisions [would] be included in the deed." *Id.* § 101–47.308–6(f)(7).

We believe it is clear from the language of these regulations that GSA construed section 414 to permit the government the option of inserting a reversionary requirement and a provision allowing for a change in use in a deed conveying property to a public body. Indeed, the Administrator confirmed this interpretation in letters to Congress regarding the conveyance at issue here. He advised the House and Senate Committees that "[c]onveyances under Section 414 of the Housing and Urban Development Act of 1969, as amended, do not require reversionary provisions in the deed when disposal is to a public body." Holifield & Ervin

Aug. 25, 1972 Letters at 5. It does not appear that GSA informed Congress that HUD intended, nevertheless, to convey the land conditionally.

In addition, copies of the San Patricio property deed, which contained the reversionary requirement and corresponding change in use provision after a twenty year lapse, were given to GSA within a week of its execution. GSA never objected to the terms of the deed or claimed they were contrary to section 414 requirements.

We believe that GSA's interpretation of section 414 was correct. As previously discussed, the legislative history supports the view that section 414(b) was adopted to mandate a reversionary provision in conveyances to private entities as a means to preclude windfalls to individuals. Accordingly, it is reasonable to conclude that the silence as to public bodies creates an option as opposed to a requirement. "Windfalls" to governmental entities are of less concern than windfalls to private parties. It is also reasonable to conclude that the duration and nature of use restrictions in conveyances to public entities were options to be negotiated on a case by case basis with the affected public entity. The contrary construction, that conveyances to public entities were required to be burdened in perpetuity while private conveyances were not, seems an unlikely congressional intent. [15]

The modifications made to the regulations in 1982 do not change our conclusion. The regulations were amended, in relevant part, to provide:

> (1) If any property conveyed under section 414(a) of the 1969 HUD Act, as amended, *to an entity other than a public body* is used for any purpose other than the purpose for which it was sold or leased within a period of 30 years of the conveyance, it shall revert to the United States (or, in the case of leased property, the lease shall terminate) unless the appropriate Secretary and the Administrator of General Services, after the expiration of the first 20 years of such period, approve the use of the property for such other purpose.

41 C.F.R. § 101–47.308–6(l) (1993) (emphasis added). The other reference in the regulation as to reversionary provisions remained the same; it continued to require HUD to specify "[w]hat reversionary provisions [would] be included in the deed." *Id.* § 101–47.308–6(f)(7).

GSA contends that the addition of the language, " 'to an entity other than a public body,' " to paragraph (l) of the regulation represents a purposeful effort

---

[15] Another indication of the reasonableness of GSA's interpretation is the silence by Congress after being advised by the Administrator of GSA's interpretation. The regulations also informed Congress of GSA's interpretation. Although Congress amended the statute after being aware of the interpretation, the language relevant here was never modified. "Where an agency's statutory construction has been fully brought to the attention of the public and the Congress,'and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.' " *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (quoting *United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979)); *see also FEA v. Algonquin SNG, Inc.*, 426 U.S. 548, 567–68, 570–71 (1976).

to clarify the "1971 regulation by unambiguously limiting the authority to approve changes in use to properties transferred to non-public bodies." Hewitt Aug. 9, 1995 Letter at 3. The language of the regulation, however, fails to achieve this "clarification." [16] Like section 414 itself, the 1982 regulation fails unambiguously to assert any limitations on conveyances to public bodies or any limitations on GSA and HUD's ability to permit changes in the use of such property. Given the clarity of the 1971 regulation, which was the regulation in force at the time of the original conveyance, and the ambiguity of the 1982 regulation, we do not believe that GSA is precluded by statute or regulation from approving a change in the use of the San Patricio property because it was conveyed to a public entity. [17] In the absence of a statutory or regulatory bar, we believe the terms of the deed are controlling. Under the deed, GSA and HUD may approve a change in use after September 27, 1994. Deed at 11, ¶7(E)(Five). [18]

We now turn to GSA's final claim that even if approval for a change of use is permissible, as a matter of law, the approval mechanism cannot be exercised in this case because of the noncompliance to date. [19] In support of this position, GSA refers to the language of section 414 and the compliance requirements of analogous real property disposal authorities.

We do not agree with GSA. The analogous regulations upon which GSA relies explicitly require compliance before a change in use is permitted. The statute,

---

[16] In addition, the 1982 changes appear to have been prompted by the passage of statutory amendments that were aimed at increasing sales of surplus property. In the notice of proposed rulemaking announcing the 1982 changes, GSA stated that the regulations were being changed to implement the 1978 and 1980 amendments to the statute, which expanded the scope of the program and reduced the restrictions. 41 C.F.R. pt. 101–47. Although the statutory amendments did not involve the language at issue here, the legislative history reveals that the statutory modifications were prompted by congressional intent to enhance utilization of the program.

In 1978, the House Committee on Banking, Finance and Urban Affairs stated that certain amendments were being made to section 414 "in order to facilitate the use of such property for housing. Activity under this program has been at a very low level and the committee hopes that these changes will result in greater utilization of surplus federal land and property for housing." Explanatory Statement of Managers at 181.

In a Senate report, the need for the 1978 amendments was explained as follows:

Unfortunately, program activity has operated at a very low level--only five or six transfers of land have been made under section 414 since 1970. While part of the problem has been the low priority given in the past to using surplus land for housing, another major constraint has been the restrictive nature of the statutory provision under which the program must operate.

S. Rep. No. 95–871, at 47 (1978).

[17] Moreover, GSA has never revised the requirement that HUD specify in any transfer request "what reversionary provisions [would] be included in the deed." 41 C.F.R. § 101–47.308–6(f)(7) (1974). The continuation of this provision without modification further supports the inference that, after the 1982 regulatory changes, reversionary provisions in deeds were optional for public body conveyances.

[18] Citing Condition Two of paragraph Seven, GSA contends that the proposed transaction is prohibited because the 1982 regulations specifically limit the right to change usage to private entities. GSA cites the 1982 regulations as relevant because Condition Two of the deed requires HUD approval, "in accordance with the then-existing regulations," for a resell of the property.

Arguably, because the proposal constitutes a change in use of the property, only Condition Five of the deed applies. *See* discussion *supra* (Condition Two applies to a resell when the property is not to be used for a different purpose.). Condition Five requires that both GSA and HUD approve the change of use. Condition Five does not have language limiting the authority to "then-existing regulations." Nevertheless, even if Condition Two of the deed were invoked by the proposed transaction at issue here, the current regulations are not a bar to the transfer.

[19] GSA also argues that, as a matter of policy, the changes of use should not be approved. We decline to comment on the policy implications raised by the proposed transaction at issue here.

regulations, and deed at issue here do not contain such an explicit condition. Nor is there language in these authorities or legislative history to support a prior compliance requirement. Indeed, the explicitness of the analogous regulations and the silence in the authorities at issue here support the absence of such a requirement in section 414 conveyances. The analogous authorities confirm that when prior compliance is intended, GSA uses explicit language to that effect. *Cf. Custis v. United States*, 511 U.S. 485, 491–92 (1994) (where Congress includes explicit language in certain statutes and omits similar language in a related statute, it is presumed that Congress acted intentionally in the disparate inclusion or exclusion).

Even if prior compliance were required, GSA concedes that compliance would not be a condition to a change in use where the noncompliance was caused by extenuating circumstances. HUD argues that the noncompliance in this matter was caused by extenuating circumstances. HUD refers to the 20 years of effort by CRUV and its successor to develop the property, the lack of HUD funding and the location of the property to support its claim that the noncompliance was not the result of any deliberate negligence by CRUV. We do not disagree that the failure to develop the property was caused by extraordinary circumstances. As outlined above, CRUV and its successor appear to have tried continuously to develop the property and often failed from faults other than their own. The proposed construction project was massive and was estimated in 1972 to cost $72 million. Indeed, GSA and HUD were aware from the beginning that the proposal to develop the property would require years of construction to complete. GSA even advised Congress that a completion date for all construction could not be estimated because of the size of the project.

The record also reveals CRUV's ongoing communication and cooperation with HUD in attempts to comply with the deed and section 414 as problems occurred. HUD and GSA were aware of the noncompliance and HUD continued to work with CRUV to provide the required housing. GSA requested that HUD either institute a reversionary action or facilitate compliance. HUD threatened to commence reversionary proceedings against CRUV. These threats apparently resulted in proposals that were acceptable to the United States. In the end, a conscious decision was made to drop the reversion action. Again, however, CRUV and HUD encountered problems in implementing the proposal. Thereafter, CRUV's successor made the proposal that is at issue here.

## III. Conclusion

In sum, the proposed transaction would constitute a change in use of the San Patricio property under section 414. Because a change in use is not barred by

statute or regulation, the deed of conveyance is controlling. Under the deed, GSA and HUD may approve the proposed change at issue here.

H. JEFFERSON POWELL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*